Richard D. McCune, State Bar No. 132124
rdm@mccunewright.com
David C. Wright, State Bar No. 177468
dcw@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:   (909) 557-1250
Facsimile:    (909) 557 1275

Emily J. Kirk, IL Bar No. 6275282*
ejk@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone:   (618) 307-6116
Facsimile:    (618) 307-6161

**Pro Hac Vice* application to be submitted

Attorneys for Plaintiff David White
and the Putative Class

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID WHITE, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>VENTURA COUNTY CREDIT UNION, and DOES 1 through 100, inclusive,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. Violation of the Electronic Fund Transfer Act (Regulation E, 12 C.F.R. §§ 1005, *et seq.*)<br><br>2. Violation of the California Unfair Competition Law (Bus. & Prof. Code § 17200, *et seq.*)<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

# **INTRODUCTION**

1.      David White ("Plaintiff") brings this lawsuit against Ventura County Credit Union ("VCCU" or "Defendant") on behalf of VCCU's members, on the basis that VCCU has violated and continues to violate federal and California law.  First, Federal Reserve Regulation E, 12 C.F.R. § 1005.1, et seq., ("Regulation E") requires that before financial institutions charge overdraft fees on one-time debit card and ATM transactions, they must (1) provide a complete, accurate, clear, and easily understandable disclosure document of their overdraft services (opt-in disclosure agreement); (2) provide that disclosure as a stand-alone document not intertwined with other disclosures; (3) obtain verifiable affirmative consent of a customer's agreement to opt into the financial institution's overdraft program; and (4) provide confirmation of the consent, including a statement informing the customer of the right to revoke such consent.  Financial institutions are not permitted to include any additional information in the opt-in disclosure agreement unless specifically authorized by Regulation E. Financial institutions must ensure these procedures are followed no matter the medium used to offer customers the option to opt-in, whether online, by telephone, or in person at a branch.  Financial institutions must not tie other benefits to an opt-in decision or use pre-checked boxes by the "opt-in" option on the opt-in disclosure agreement. Moreover, regulators have warned that financial institutions should not aggressively market the benefits of Regulation E overdraft coverage, promote the coverage as a short-term credit, or otherwise encourage customers to opt-in.

2.      In order to comply with Regulation E, VCCU must provide members with a Regulation E opt-in disclosure agreement that accurately describes its overdraft services.  But VCCU does not provide its members, including Plaintiff, with an accurate and/or easily understandable Regulation E opt-in disclosure agreement describing the circumstances or conditions in which VCCU charges overdraft fees.

3.      Because Regulation E does not permit financial institutions to charge overdraft fees until they obtain affirmative consent through an accurate disclosure of

their overdraft practices in a stand-alone opt-in disclosure agreement, VCCU's assessment of all overdraft fees against members for one-time debit card and ATM transactions has been and continues to be illegal.  Further, VCCU's continued use of a non-conforming disclosure agreement to "opt-in" new members to its overdraft service is invalid.  Regulation E provides a cause of action against financial institutions that fail to abide by its requirements.

4.  Second, VCCU's actions also violate California's Unfair Competition Law, California Business & Professions Code § 17200.  VCCU's failure to satisfy Regulation E provides the prerequisite acts for demonstrating that VCCU has engaged in an unlawful business practice pursuant to Section 17200.  But VCCU goes one step further and engages in unfair business practices by advertising its overdraft program as akin to a short-term loan program.  When compared to interest rates on a normal loan, overdraft fees constitute a functional rate of interest far higher than banks would be able to charge on a regular loan.  A $3 cup of coffee can trigger the bank charging a fee many times more than that, for a nominal amount that the bank will likely be repaid in a day or so.  This service is only made available to consumers because overdraft services are meant to be only a short-term, discretionary means of allowing consumers to make timely purchases on occasions when there is not money in their accounts to cover their purchases.  But VCCU effectively advertises its overdraft program as a loan program, inviting those that are unable to pay their overdraft balances in less than 30 days to enter into a "payment plan" with the credit union—converting the overdraft program into an entryway to a loan.  The Federal Reserve has already warned against this approach, and California very carefully polices attempts to evade usury and other high-interest circumstances designed to gouge consumers.  Luring consumers into taking on loans through an overdraft program is just the kind of unfair business practice that Section 17200 was meant to enjoin.

5.  Based on the violation of Regulation E and Section 17200, Plaintiff seeks statutory damages, as well as the return of improperly charged overdraft fees within the

statute of limitations periods.  Plaintiff also seeks to enjoin VCCU from continuing to obtain new members' "consent" to be assessed overdraft fees by using an opt-in disclosure agreement that violates Regulation E and from continuing to assess any further overdraft fees on Regulation E transactions until it obtains the consent of current members using a Regulation E opt-in disclosure agreement.

## NATURE OF THE ACTION

6.     All allegations herein are based upon information and belief except those allegations pertaining to Plaintiff or counsel (unless otherwise stated).  Allegations pertaining to Plaintiff or counsel are based upon, *inter alia*, Plaintiff's or counsel's personal knowledge, as well as Plaintiff's or counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

7.     Plaintiff has brought this class and representative action to assert claims in his own right, as the class representative of all other persons similarly situated, and in his capacity as a private attorney general on behalf of members of the general public. Regulation E requires VCCU to obtain informed consent, by way of a written stand-alone document that fully and accurately describes in an easily understandable way its overdraft services, before charging members an overdraft fee on one-time debit card and ATM transactions.  Because of the substantial harm caused by large overdraft fees on relatively small debit card and ATM transactions, Regulation E requires financial institutions to put all mandated overdraft information in one clear and easily understood document.  Financial institutions are not permitted to circumvent this requirement by referencing, or relying on, their account agreements, disclosures, or marketing materials.  Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with account holders regarding the institution's overdraft policies.

8.    Similarly, VCCU's disclosures must be presented clearly and conspicuously, and terminology used to describe features of the account must be consistent throughout.  In addition, to the extent VCCU markets or advertises its overdraft services, such materials must be not misleading, inaccurate, or misrepresent an account's terms in any way.

9.    VCCU does not meet these requirements.  It does not provide its members with a compliant stand-alone Regulation E opt-in disclosure agreement because, *inter alia*, it fails to accurately and in an easily understandable manner describe its overdraft services including, but not limited to, failing to state or clearly describe its overdraft procedures within the four corners of the opt-in agreement.  It also fails to include all of the information mandated by Regulation E, and includes additional information not permitted.  Furthermore, the opt-in disclosure agreement uses inconsistent terminology to describe VCCU's overdraft services, and it misrepresents and/or promotes the overdrafts services in a misleading manner in violation of Truth in Savings Act, 12 C.F.R. § 707.1, *et seq.* ("TISA").

10.    In its opt-in disclosure agreement as it appears on VCCU's website, VCCU explains that when one of its members has "insufficient funds" to cover a transaction, that member, if opted in to VCCU's overdraft program ("Courtesy Pay"), will have the overdraft covered and will be charged a $30 fee.[1]  Yet in another section, it states that "Courtesy Pay works to [a member's] advantage and as protection if [the member] make[s] a purchase or transaction for more than [the] available balance."  VCCU further states that Courtesy Pay applies when "funds are not available."  VCCU uses these terms interchangeably but fails to explain what "available balance," "insufficient funds," or "funds are not available" mean.  The result of VCCU's inconsistent use of terminology to describe when Courtesy Pay applies to a member's account creates an

---

[1] See Exhibit A, which, on information and belief, reflects the text of VCCU's Regulation E opt-in disclosure agreement as it currently appears on VCCU's website.

ambiguity as to the balance on which VCCU determines overdraft fees, which, on information and belief, includes VCCU's deduction of various holds on funds that are in the account and purportedly unavailable for the consumer's use.  While law permits VCCU to account for these holds in calculating whether an overdraft has occurred, Regulation E equally requires VCCU to clearly and unambiguously disclose the nature of how it calculates overdrafts and under what conditions fees are charged.

11.    In a nearly identical version of the opt-in disclosure agreement, VCCU includes other terms to describe its Courtesy Pay services, but still does not explain what they mean.[2]  In this version, it interchangeably refers to "insufficient available funds," "funds not available," and "available balance," which also fail to clearly, and in an easily understandable manner, describe VCCU's overdraft services as required by Regulation E.  In addition, this version of the opt-in disclosure agreement does not list the overdraft fee amount.  Instead, the opt-in disclosure agreement requires members to refer to another document—the credit union's fee schedule—to determine the "current fee," violating Regulation E's mandate that the opt-in disclosure agreement specifically state the amount of "any fees or charges assessed."  12 C.F.R. § 1005.17(d).

12.    Regulation E also requires that an opt-in disclosure agreement state, *inter alia*, 1) the maximum number of overdraft fees or charges that may be assessed per day, or, if applicable, that there is no limit; and 2) any offers of a line of credit or a service that transfers funds from another account to the consumer, if the financial institution offers any such services.  VCCU's opt-in disclosure agreement contains no such disclosures.  *Id.*  The opt-in disclosure agreement also fails to disclose that VCCU covers overdraft transactions only at its own discretion, and that if VCCU does not authorize and pay an overdraft transaction, it may be declined.  *Id.*, Comment 17(d)(1).

13.    Further, the opt-in disclosure agreement includes additional disclosures Regulation E forbids, including the overdraft limit of $1,000 and repayment terms, and

---

[2] See Exhibit B, which, on information and belief, reflects the text of VCCU's stand-alone Regulation E opt-in disclosure agreement.

improperly calls attention to the line where members are to affirmatively opt-in by using a large, boldfaced font compared to the smaller, regular font identifying the choice to "opt-out." (*See* Ex. B.) Accordingly, not only does VCCU's opt-in disclosure agreement fail to contain the information Regulation E requires, it contains additional information that violates Regulation E, and as a whole fails Regulation E's requirement that the opt-in disclosure agreement be "substantially similar" to Model Form A-9.[3] *Id.*

14.   The opt-in disclosure agreement also fails to comply with TISA's requirements that account disclosures be presented clearly, and in a non-misleading way. Not only does VCCU use inconsistent and ambiguous terminology to describe how and when overdraft fees are assessed, the opt-in disclosure agreement misrepresents aspects of the overdraft program in order to drive members to affirmatively consent to overdraft coverage. For example, the opt-in disclosure agreement markets the Courtesy Pay overdraft program as a "special kind of overdraft coverage" that "works to your advantage." Moreover, VCCU markets Courtesy Pay as if it is a line of credit, disclosing the maximum amount of Courtesy Pay coverage available (*e.g.*, "Courtesy Pay may cover items such as ATM withdrawals, up to a $1000 limit."), and describing it as a "short term option" that requires repayment within 30 days (or the establishment of a payment plan).

15.   VCCU's attempt to use its overdraft program as an entry toward a *de facto* lending program constitutes an unfair business practice. By marketing its program in this fashion, VCCU encourages its members to increase their overdrafts by irregular means. Unlike in normal lending programs, VCCU members are not loaned money after they go through the usual vetting process to ensure a reasonable expectation of being able to fulfill the loan. Instead, VCCU members are encouraged to bypass these safety valves and incur debt they are at high risk of not being able to repay.

---

[3] *See* Regulation E, Model Form A-9 attached hereto as Exhibit C.

16.   Plaintiff has been harmed by VCCU's violations of these regulations.  On information and belief, Plaintiff was opted in to VCCU's overdraft program using an improper disclosure agreement that failed to adequately describe, and misrepresented to members, VCCU's overdraft practices.  Further, Plaintiff has been assessed overdraft fees on transactions that were not permitted because VCCU obtained Plaintiff's "consent" using the non-compliant agreement.  This action seeks statutory damages, restitution, and injunctive relief due to, *inter alia*, VCCU's policy and practice of obtaining "affirmative consent" using a noncompliant opt-in disclosure agreement while improperly advertising and marketing its overdraft services.

## **PARTIES**

17.   Plaintiff David White is a resident of Haslet, Texas, and a VCCU member at all relevant times to this Complaint.

18.   Based on information and belief, Defendant VCCU is a credit union with its headquarters and principal place of business in Ventura, California.  VCCU maintains several branches throughout Ventura County, California.

19.   Without limitation, defendants DOES 1 through 5, include agents, partners, joint ventures, subsidiaries, and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations.  As used herein, where appropriate, the term "Defendant" is also inclusive of Defendants DOES 1 through 5.

20.   Plaintiff is unaware of the true names of Defendants DOES 1 through 5. Defendants DOES 1 through 5 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against Defendants DOES 1 through 5 when the true names are ascertained, or as permitted by law or the Court.

21.   There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

Class Action Complaint
Case No.:

22.     At all material times herein, each defendant was the agent, servant, co-conspirator, and/or employer of each of the remaining defendants; acted within the purpose, scope, and course of said agency, service, conspiracy, and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants; and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

23.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

24.     As to the conduct alleged herein, each act was authorized, ratified, or directed by Defendant's officers, directors, or managing agents.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, 15 U.S.C. § 1693m, and 28 U.S.C. § 1367(a). This Court has supplemental jurisdiction over Plaintiff's state-law claim, pursuant to 28 U.S.C. § 1367. This Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 under the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class Members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States.

26.     Venue is proper in this District because VCCU maintains its headquarters in this District, transacts business in this District, and VCCU executed the unlawful policies and practices which are the subject of this action in this District.

Class Action Complaint
Case No.:

# BACKGROUND

## A.  Defendant VCCU

27.     VCCU is a credit union headquartered in Ventura, California, with branches in several cities across Ventura County.  As of December 31, 2020, according to its financial filings, it reported having just over 75,000 members and holding over $1 billion in assets.  VCCU reports that in 2020 alone, it collected just approximately $4.7 million in fee income, of which overdraft fees are believed to be a significant percentage.

28.     One of VCCU's main services is a share deposit account, or checking account.[4]  A checking account balance can increase or be credited in a variety of ways, including automatic payroll deposits; electronic deposits; incoming transfers; deposits at a branch; and deposits at ATM machines.  Debits decreasing the amount in a checking account also can be made by using a debit card for purchases of goods and services (point of sale purchases) that can be one-time purchases or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic purchases. Additionally, some of the other ways to debit the account include writing checks; issuing electronic checks; scheduling Automated Clearing House (ACH) transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of transactions that debit from a checking account.

29.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), Defendant assesses overdraft fees (a fee for paying an overdrawn item) and NSF fees (a fee for a declined, unpaid returned item) to its members' accounts when it claims to have determined that an account has been overdrawn.

30.     The underlying principle for charging overdraft fees is that when a financial institution pays a transaction by advancing its own funds to cover the account

---

[4] This is a credit union's formal nomenclature for what is more commonly known as a "checking" account at banks.

holder's insufficient funds, it may charge a *contracted and/or disclosed* fee, provided that charging the fee is not prohibited by some legal regulation.  The fee Defendant charges here constitutes very expensive credit in the overdraft context that harms the poorest customers and creates substantial profit.  According to a 2014 Consumer Financial Protection Bureau ("CFPB") study:[5]

- Overdraft and NSF fees constitute the majority of the total checking account fees that customers incur.

- The transactions leading to overdrafts are often quite small.  In the case of debit card transactions, the median amount of the transaction that leads to an overdraft fee is $24.

- The average overdraft fee for bigger banks is $34 and $31 for smaller banks and credit unions.

Accordingly, as highlighted in the CFPB Press Release related to this study:

> Put in lending terms, if a consumer borrowed $24 for three days and paid the median overdraft of $34, **such a loan would carry a 17,000 percent annual percentage rate (APR).**

(Emphasis added.)[6]

31.     Overdraft and NSF fees constitute a primary revenue generator for banks and credit unions.  According to one banking industry market research company, Moebs Services, banks and credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.[7]

32.     Defendant's financial filings and practices reveal that it has followed these trends to the letter.  Defendant charges an overdraft fee of $30 per item.  But even if it

---

[5] https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf (last visited Jan. 20, 2021).
[6] CFPB, CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges (7/31/2014) https://www.consumerfinance.gov/about-us/newsroom/cfpb-finds-small-debit-purchases-lead-to-expensive-overdraft-charges/ (last visited Jan. 20, 2021).
[7] Moebs Services, Overdraft Revenue Inches Up in 2018 (March 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018%200032719-1.pdf?ver=2019-03-27-115625-283 (last visited Jan. 20, 2021).

Class Action Complaint
Case No.:

had been properly charging overdraft fees, the $30 overdraft fee bears no relation to its minute risk of loss or cost for administering overdraft and non-sufficient funds services. But an overdraft fee's practical effect is to charge those who pay them an interest rate with an APR in the thousands.

33.     Accordingly, overdraft fees are punitive fees rather than service fees, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee.  A 2012 study found that more than 90% of customers who were assessed overdraft fees overdrew their accounts by mistake.[8]  In a 2014 study, more than 60% of the transactions that resulted in a large overdraft fee were for less than $50.[9]  More than 50% of those assessed overdraft fees do not recall opting into an overdraft program, *id*. at p. 5, and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than being charged a very large fee, (*id*. at p. 10).

34.     Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb the overdraft fees. Younger, lower-income, and non-white accountholders are among those most likely to be assessed overdraft fees.  *Id*. at p. 3.  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  *Id*.  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  *Id*. at p. 4.  And non-whites are 83% more likely to pay an overdraft fee than whites.  *Id*. at p. 3.

## B.     Regulation E

35.     For many years, banks and credit unions have offered overdraft services to their account holders.  Historically, the fees these services generated were relatively

---

[8] Pew Charitable Trust Report, *Overdraft America: Confusion and Concerns about Bank Practices*, at p. 4 (May 2012), https://www.pewtrusts.org/-/media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america1pdf.pdf (last visited Jan. 20, 2021).

[9] Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014), https://www.pewtrusts.org/-/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf (last visited Jan. 20, 2021).

low, particularly when methods of payment were limited to cash, check, and credit card. But the rise of debit card transactions replacing cash for smaller transactions—especially for younger customers who carried lower balances—provided an opportunity for financial institutions to increase the number of transactions in a checking account that could potentially be considered overdraft transactions, and for which the financial institution could assess a hefty overdraft fee. The increase in these types of transactions was timed perfectly for financial institutions, which faced falling revenue as a result of lower overall interest rates and the rise of competitive innovations such as no-fee checking accounts. Financial institutions thus recognized in overdraft fees a new and increasing revenue stream.

36.    As a result, the overdraft process became one of the primary sources of revenue for financial depository institutions—banks and credit unions—both large and small. As such, financial institutions became eager to provide overdraft services to consumers because not only do overdrafts generate revenue, they do so with little risk. When an overdraft is covered, it is on average repaid in three days, meaning that the financial institution advances small sums of money for no more than a day or two.

37.    Using common understanding, an overdraft occurs when two conditions are satisfied. First, the consumer initiates a transaction that will result in the money in the account falling below zero if the financial institution makes payment on the transaction. Second, the financial institution pays the transaction by advancing its own funds to cover the shortfall. An overdraft, therefore, is an extension of credit. The financial institution advancing the funds, allows the accountholder to continue paying transactions even when the account has no money in it, or the account has insufficient funds to cover the amount of the withdrawal.[10] The financial institution uses its own money to pay the transaction, on the assumption that the account holder will eventually cover the shortfall.

---

[10] For a thorough description of the mechanics of an "overdraft," *see* https://www.investopedia.com/terms/o/overdraft.asp (last visited Jan. 20, 2021).

38.     Before the Federal Reserve amended Regulation E regarding requirements for overdraft services, many financial institutions unilaterally adopted internal "overdraft payment" plans.  Consumers would initiate transactions that financial institutions would identify as "overdrafts," then the financial institution would cover the overdraft while charging the standard overdraft fee.  Under such programs, consumers were charged a substantial fee—on average higher than the debit card transaction triggering the overdraft itself—without ever having made any choice as to whether they wanted such transactions approved or instead declined and providing the opportunity to select another form of payment rather than turning a $4 cup of coffee at Starbucks into a $40 cup of coffee.

39.     The Federal Reserve, which has regulatory oversight over financial institutions, recognized that banks and credit unions had strong incentives to adopt these punitive overdraft programs.  Banks and credit unions could rely on charging high fees for very little service and almost no risk on thousands of transactions per day, giving consumers no choice in the matter if they wanted to have a bank account at all.  It is for these reasons that in 2009, the Federal Reserve Board amended Regulation E to require financial institutions to obtain affirmative consent (or so-called "opt in") from account holders for overdraft coverage on ATM and non-recurring "point of sale" debit card transactions.  After Regulation E's amendment, a financial institution could only lawfully charge an overdraft fee on one-time debit card purchases and ATM withdrawals if the consumer opted into the financial institution's overdraft program.  Otherwise, the bank or credit union could either cover the overdraft without charging a fee, or direct the transaction to be denied at the point of sale.  Further, without the opt-in, the financial institution could not charge an NSF fee because denying an ATM withdrawal or one-time debit card purchase meant no transaction had ever taken place, and thus there was no transaction to return.

40.     After the CFPB's creation, it subsequently undertook the study referenced above regarding financial institutions' overdraft programs and whether they were

satisfying consumer needs.  Unsurprisingly, the CFPB found that overdraft programs had a series of problems.  The most pressing problem was that overdraft services were costly and damaging to account holders.  The percentage of accounts experiencing at least one overdraft (or NSF) transaction in 2011 was 27%, and the average amount of overdraft and NSF-related fees paid by accounts that paid fees was $225.  The CFPB further estimated that the banking industry may have collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts.  The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."[11]

41.     Given the state of overdraft programs prior to Regulation E's amendment, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees.  Banks and credit unions in this scenario had significant advantages over consumers when it came to imposing overdraft policies.  By defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario— advance small amounts of funds (average $24) for a small period of time (average 3 days), then charge a large fee (average $34) that is unrelated to the amount of money advanced on behalf of the customer, resulting in an APR of thousands of percent interest (using averages—17,000% APR), all while assuming very little risk because only a very small percentage of overdraft customers fail to repay an overdraft.

42.     Because of this, Regulation E does not merely require a financial institution to obtain an opt-in disclosure agreement before charging fees for transactions

---

[11] The Federal Reserve has previously noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management."  69 Fed. Reg. 31761 (June 7, 2004).

that result in overdrafts.  It also provides that the opt-in disclosure agreement must satisfy certain requirements to be valid.  The agreement must be a stand-alone document, segregated from other forms, disclosures, or contracts provided by the financial institution.  It must also accurately disclose to the account holder the institution's overdraft charge policies.  The account holder's choices must be presented in a "clear and readily understandable manner."  12 C.F.R. § 1005.4(a)(1).  The financial institution must ultimately establish that the account holder has opted-in to overdraft coverage either through a written agreement, or through a confirmation letter to the customer confirming opt-in if the opt-in has taken place by telephone or computer after being provided a compliant opt-in disclosure agreement.

43.     Further, when the Federal Reserve amended Regulation E to require consumer opt-in for overdraft protection, it expected that financial institutions would not actively encourage consumer opt-in as a means to recover lost revenue resulting from the opt-in requirement.  This expectation was made clear in the official interpretation of the amendment which stated that "under Regulation DD,[12] advertisements may not be misleading or inaccurate" and similarly that financial "institutions must not market their overdraft services in a manner that constitutes an unfair or deceptive practice within the meaning of the Federal Trade Commission Act, 15 U.S.C. 41 *et seq*."  *See* Electronic Fund Transfers, 75 FR 31665-01, 2010 WL 2212981 (F.R. June 4, 2010).  Further, after implementation of the Consumer Financial Protection Act of 2010, financial institutions were prohibited from engaging in any "unfair, deceptive, or abusive act or practice . . . in connection with any transaction with a consumer for . . . overdraft services."  12 U.S.C. § 5531(a).

44.     In the wake of Regulation E, some financial institutions simply decided to forego charging overdraft fees on non-recurring debit card and ATM transactions.  These include large banks such as Bank of America, and smaller banks such as One

---

[12] Regulation DD applies to depository institutions other than credit unions.  The equivalent for state-chartered credit unions is TISA, 12 C.F.R. § 707.1, *et seq*.

West Bank, First Republic Bank, and Mechanics Bank.  However, most financial institutions continued to maintain overdraft services on one-time debit card and ATM withdrawals.  As such, these banks and credit unions must satisfy Regulation E's requirements in order to obtain compliant affirmative consent from their accountholders before charging overdraft fees on eligible transactions.

45.    But charging these exorbitant penalty fees for the bank or credit union's small advance of funds to cover overdrafts was not where it stopped.  Many financial institutions began manipulating the process as to when they would consider a transaction an overdraft to further increase the profit generated by their overdraft programs. Instead of charging overdraft fees only when the financial institution actually advanced money on behalf of the customer, they began assessing overdraft fees on transactions they paid with customers' own funds. That is, the financial institution unilaterally decided the account was overdrawn—not by the actual lack of funds in the account—but by whether the money in the account, minus holds the financial institution unilaterally decided were for future events, was enough to cover an ATM or one-time debit transaction when, some time in the future, these transactions came in for payment.

46.    Most banks and credit unions calculate two account balances related to their accounting of a customer checking account.  "Actual balance," "ledger balance," "current balance" or even "balance" are all terms used to describe the actual amount of the accountholder's money in the account at any particular time.  In contrast, "available balance" is a term of art the financial industry uses to describe the balance reduced from the actual account balance by the amount the bank or credit union has either held from deposits or held from the account because of authorized debit transactions that have not yet come in (and may never come in) for payment.[13]  But absent further explanation, terms like "available balance" have little or no meaning to reasonable consumers.  As a

---

[13] Some financial institutions use a third balance called the collected balance, which is also an internal calculated balance that is the actual account balance minus only deposit holds,and does not include debit holds.

result, it is important for financial institutions to clarify what "available balance" means because it is only by defining that term that consumers can know what it means.

47.     Although financial institutions calculate the two balances, the actual/ledger/current balance of the money in the account is the official balance.  It is used when financial institutions report deposits to regulators, when they pay interest on an account, and when they report the amount of money in the account in monthly statements to the customer—the official record of the account.

48.     While there is no regulation barring any financial institution from deciding whether it will assess overdraft or NSF fees based on the actual account balance or the "available balance" for overdraft and NSF assessment purposes, per Regulation E, the terms of the overdraft program must be clearly and accurately disclosed.  Whether the financial institution uses the actual money in the account or some other artificial balance to assess overdraft fees, is information the customer needs to understand the overdraft program.

49.     Many financial institutions use the "available balance" for overdraft assessment purposes as it consistent with these institutions' self-interest because the available balance is always the same or lower, by definition, than the actual balance. The actual balance includes all money in the account.  On the other hand, the available balance always subtracts any holds placed on the funds in the account that may affect the money in the account in the future.  It never adds funds to the account.  To be clear, even when a financial institution has put a hold on funds in an account, the funds remain in the account.  The financial institution's "hold" is merely an internal characterization the bank or credit union uses to categorize some of the money.  All of the accountholder's money remains in the account, even the money Defendant has defined as "held."  The fact that the money has a "hold" on it does not mean it has been removed from the account.

50.     The difference between which of the two balances a financial institution may use to calculate overdraft transactions is material to both the financial institution

and account holders.  Prior investigation in similar lawsuits demonstrates that financial institutions using the available balance, instead of actual balance, increase the number of transactions that are assessed overdraft fees approximately 10-20%.  What happens in those 10-20% of transactions is that sufficient funds are in the account to pay the transaction and therefore the bank or credit union has not advanced any funds to the customer.  At all times, the financial institution uses the customer's own money to pay the transaction, which really means there has never been an overdraft at all—yet the financial institution charges an overdraft fee on the transaction anyway.

51.    A hypothetical demonstrates what the financial institution does under these circumstances.  Suppose that an individual has $1,000.  The individual intends to use $800 of this amount to pay rent.  The individual then intends to use the other $200 to make his monthly car payment.  But before the rent and car payment come due, the individual receives a $40 water bill which informs that the bill must be paid immediately, or water service will be cut off.  The individual now takes $40 from the money he has earmarked for his car payment to pay the water bill.  This individual has not spent more money that he has on hand—but he does need to find an additional $40 before the car payment comes due.  And if the individual does find the additional $40 before paying the car payment, there will never be a problem.  If he falls short, he may choose to proceed with the transaction anyway, for example, by writing a check for the car payment when he does not have funds to cover the bill.  He would then create a potential "overdraft" of his funds for the car payment, but not the rent payment and the water bill.

52.    The same pattern holds for financial institutions that calculate overdrafts using the actual (or ledger or current) balance of an account.  Suppose the same individual put the $1,000 in his checking account under similar circumstances on the 27th of the month.  That day, he also authorizes his $800 rent to be paid on the first of the next month, and his $200 car payment to be paid on the third of the next month. The individual then realizes that the $40 payment on his water bill must be paid that

day—the 27th of the month—or he will incur a fee.  He approves the water bill payment, and it posts immediately.  Then, a few days later, he transfers an additional $40 into the account which is enough to offset the water bill payment before the initial $800 rent and $200 car payments post and clear the account.  All three payments are made with the individual's own account funds.  The financial institution never uses its own funds as an advance, and there is no "overdraft" of the account because the balance always remains positive.  However, even if the customer does not transfer the $40, it is only the car payment which posts last that is paid without sufficient money in the account to cover it.  Thus, there is only one transaction (*i.e.*, the car payment) eligible for an overdraft fee.

53.     A financial institution using the "available balance" method of calculating overdrafts would come to a different conclusion.  Because the available balance subtracts from the account the amount of money that the financial institution is "holding" for other pending transactions, the financial institution considers the money set aside and unavailable, even though it is still in the account.  This means that after the $800 and $200 transactions are scheduled, the "available balance" of the account is $0 even though $1,000 still remains in the account.  Under these circumstances, when the individual makes the additional $40 payment and it posts first, the "available balance" is negative and the accountholder is charged an overdraft fee—even though the original $1,000 is still in the account.  And what is worse, even if the accountholder deposits $40 in the account before the original $800 and $200 payments post and clear, he is still subject to the overdraft fee for the $40 transaction even though the financial institution never "covered" any portion of the payment with its own funds.  Finally, what is worse still, if the customer does not make a deposit to cover the overdraft, the customer will be assessed an overdraft fee for all three transactions.  Thus, using the available balance, although the financial institution only has to advance its own funds for one transaction (*i.e.,* the car payment), the financial institution will assess three overdraft fees tripling its profits from the same transactions.

54.     Financial institutions have been put on notice by regulators, banking associations, their insurance companies and risk management departments, and from observing litigation and settlements that the practice of using the available balance instead of the actual amount of money in the account (*i.e.*, the actual, ledger, or current balance) to calculate overdrafts *without clear disclosure of that practice* likely violates Regulation E and other state laws.  For instance, the FDIC stated in 2019:

> Institutions' processing systems utilize an "available balance" method or a "ledger balance" method to assess overdraft fees. The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.[14]

The CFPB provided in its Winter 2015 Supervisory Highlights, that:

> A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the balance calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive.[15]

55.     Under Regulation E, the financial institution may decide which balance it chooses to use for overdraft fees on one-time debit card and ATM transactions, but it is

---

[14] https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf (last visited Jan. 20, 2021).
[15] https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf, p. 8 (last visited Jan. 20, 2021).

Class Action Complaint
Case No.:

also very clear that it must disclose this practice accurately, clearly and in a way that is easily understood.  As the Regulation E opt-in disclosure agreement must include this information in a stand-alone document, the use of available balance must be stated and explained in the opt-in disclosure agreement to conform to Regulation E and permit the financial institution from charging that customer overdraft fees on one-time debit card and ATM transactions.  Either inaccurately or ambiguously describing the use of which balance a financial institutions uses as part of its overdraft practice violates the plain language of Regulation E.

## C.   VCCU's Regulation E Practices

56.   VCCU opts members into its overdraft program using an opt-in disclosure agreement that violates Regulation E.  The opt-in disclosure agreement is inaccurate and/or unclear because, *inter alia*, it does not inform Plaintiff and putative class members about VCCU's method of assessing overdraft fees.

57.   In the web version of its opt-in disclosure agreement, VCCU explains that when a member has "insufficient funds" to cover a transaction, that member if opted into VCCU's overdraft program will have the overdraft covered and will be charged a $30 fee.  In another section, it states that "Courtesy Pay works to [a member's] advantage and as protection if [the member] make[s] a purchase or transaction for more than [the] available balance."  VCCU also states that Courtesy Pay applies when "funds are not available."  VCCU fails to explain what these terms mean such that a member could determine the balance on which VCCU assesses overdraft fees.

58.   In another nearly identical version of the opt-in disclosure agreement, VCCU includes additional terms to describe its Courtesy Pay services, such as "insufficient available funds," but does not explain what that term means or how it relates to "available balance," "insufficient funds," and "funds not available."

59.   Many courts have already found that failing to clearly and accurately describe an overdraft program in an opt-in disclosure agreement can constitute a

-22-

Regulation E violation.[16]  By using inaccurate and/or ambiguous language to describe what constitutes an overdraft, VCCU failed to provide the clear and easily understandable description of its overdraft services that Regulation E demands.

60.     Institutions that use an account's "available" balance to calculate overdrafts disclose it in a far more clear and specific manner than VCCU.  For example, Synovus Bank defines an overdraft as when there is not enough money in an account, but adds the additional caveat that it "authorize[s] and pay[s] transactions using the Available Balance in [the] account," and then specifically defines the Available Balance.  TD Bank's opt-in disclosure agreement states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway.  Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals) and includes any deposited funds that have been made available pursuant to our Funds Availability Policy."  Similarly, Communication Federal Credit Union's opt-in disclosure agreement states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, or the transaction exceeds your available balance, but we pay it anyway.  'Available Balance' is your account balance less any holds placed on your account."

---

[16] *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1237-38; 1243-45 (11th Cir. 2019); *Wellington v. Empower Fed. Credit Union,* 2021 WL 1377789, *4 (N.D.N.Y Apr. 13, 2021); *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 261-66 (D. Mass. 2019); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 855-57 (W.D. Mich. 2016); *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 343-46; 348 (D.N.H. 2018) (holding that terms such as "enough money," "insufficient funds," "nonsufficient funds," "available funds," "insufficient available funds," and "account balance" were ambiguous such that the Reg E claim was not dismissed ); *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2017 WL 3597522, at *6–8 (D. Haw. Apr. 13, 2017) ("sporadic" use of terms such as "available" funds or balances insufficiently explained to consumer when overdraft fee could be charged and ambiguous use of terms in opt-in agreement constituted a proper allegation of a Reg E violation); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 375-76 (D. Conn. 2018) (holding that allegations were sufficient to state a cause of action for violation of Reg E where opt-in form failed to provide customers with a valid description of overdraft program); *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991, at *4-8 (N.D. Cal. Mar. 21, 2017); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009, at *3-4 (D. Nev. June 22, 2016).

61.     Both versions of VCCU's opt-in disclosure agreement also fail to meet Regulation E's requirements in other ways.  Each fails to disclose 1) the maximum number of overdraft fees or charges that may be assess per day, or, if applicable, that there is no limit; 2) a line of credit or a service that transfers funds from another account to the consumer, if such services are offered; and 3) that overdrafts are paid at VCCU's discretion, and that if VCCU does not authorize and pay an overdraft, the transaction may be declined—all of which Regulation E requires.  12 C.F.R. § 1005.17(d).  Moreover, the hardcopy version of VCCU's opt-in disclosure agreement fails to list the amount of the overdraft fee.  *Id.*  Further, Regulation E does not permit an opt-in disclosure agreement to contain any information not specified in the regulation, yet VCCU includes the overdraft limit of $1000 and invited the consumer to enter into long term-repayment plans.  In addition, VCCU improperly calls attention to the line where members are to affirmatively opt-in by using a large, boldfaced font compared to the smaller, regular font identifying the choice to "opt-out."  Accordingly, not only does the opt-in disclosure agreement fail to contain the information required by Regulation E, it contains additional information in violation of Regulation E, and as a whole fails to meet Regulation E's requirement that the opt-in disclosure agreement be "substantially similar" to Model Form A-9.  *Id.*

62.     Here, VCCU failed to accurately, clearly, and in an easily understandable way disclose its overdraft policies, and it failed to provide its members with a Regulation E complaint opt-in disclosure agreement.  Thus, it continues to charge Plaintiff and Class Members overdraft fees for non-recurring debit card and ATM transactions in violation of Regulation E.  Further, on information and belief, VCCU continues to "opt-in" new members to its overdraft program using the same improper opt-in disclosure agreement.

**D.     TISA**

63.     TISA's purpose is to ensure that potential and current members of credit unions can make informed decisions about their accounts.  12 C.F.R. § 707.1.  It

requires credit unions present disclosures, clearly and conspicuously, in writing, an in a form that members can keep.  12 C.F.R. § 707.3.  The format of disclosures must allow for easy and understandable review, and they must use the same terminology to describe account terms throughout.  12 C.F.R. § Pt. 707, App. C.  And advertisements or marketing of overdraft services must be done in an accurate and non-misleading way.  12 C.F.R. § 707.8; 12 C.F.R. § 707.11 (b).

64.    VCCU's opt-in disclosure agreement fails to clearly and conspicuously explain the terms of its overdraft program to consumers.  For one thing, VCCU varies the terminology it uses to identify the balance on which it assesses overdraft fees, sometimes using terms that courts have identified as meaning the actual account balance, *i.e*., "insufficient funds," while also sporadically using the word "available."  As written, the opt-in disclosure agreement inaccurately and/or misleadingly describes VCCU's overdraft program.  Further, VCCU misleads its members regarding its Courtesy Pay program, calling it a "special kind of overdraft coverage" that "works to your advantage."  And VCCU markets Courtesy Pay as if it were a line of credit, disclosing the maximum amount of Courtesy Pay coverage available (*e.g.,* "Courtesy Pay may cover items such as ATM withdrawals, up to a $1000 limit."), and describing it as a "short term option" that requires repayment within 30 days (or the establishment of a payment plan).  Any reasonable consumer would assume that the credit union is offering the equivalent of a $1,000 pay-day loan, if at usurious rates.  This is precisely the type of misuse of an overdraft program that Regulation E was drafted to avoid, as it misrepresents the true purpose of an overdraft program and effectively obtains consumer "opt-in" for a credit line at interest rates VCCU could not charge as part of its standard lending practices.

## FACTUAL ALLEGATIONS AGAINST DEFENDANT

65.    At all relevant times, VCCU failed to define the terms "insufficient funds," "insufficient available funds," "funds not available," and "available balance" in the standard opt-in disclosure agreement it uses to enroll members in its overdraft program

for one-time debit card and ATM transactions.

66.     At all relevant times, VCCU knew or should have known, that in order to legally charge overdraft fees to members, it was required to first obtain affirmative consent from each member using a Regulation E compliant stand-alone opt-in disclosure agreement.  Regulation E compliance requires, at a minimum, that a financial institution accurately disclose all material parts of its overdraft program and policies in the opt-in disclosure agreement in clear and easily understood language.

67.     At all relevant times, on information and belief, VCCU used nearly identical opt-in disclosure agreements to opt-in Plaintiff and all putative class members.

68.     On information and belief, VCCU's opt-in disclosure agreement does not accurately and in a clear and easily understandable way describe VCCU's overdraft services including, but not limited to, failing to clearly describe the terms upon which VCCU charges overdraft fees to its members.

69.     Because VCCU uses an opt-in disclosure agreement that does not accurately and clearly describe its overdraft practices, VCCU has not been permitted to charge members overdraft fees on one-time debit card and ATM transactions, yet it does so anyway.

70.     At all relevant times, VCCU knew it was using a specific "available" balance methodology to assess overdraft fees, and further knew or should have known that its methodology should be clearly and accurately described in a stand-alone document.  VCCU also knew or should have known that its opt-in disclosure agreement failed to provide an accurate, clear, and easily understandable definition of an overdraft.

71.     At all relevant times, Defendant knew or should have known that TISA required an accurate disclosure of overdraft services in a clear and conspicuous manner, and that it prohibited the use of inconsistent terminology to describe such terms.

72.     At all relevant times, VCCU used inconsistent terminology when referring to the balance used to assess overdraft fees, referencing "insufficient funds," "funds not available," "insufficient available funds" and "available balance" interchangeably with

no further explanation.

73. At all relevant times, VCCU misrepresented its overdraft program and promoted it inaccurately and/or in a misleading way.

74. At all relevant times, VCCU charged Plaintiff and the putative class members overdraft fees on one-time debit card and ATM transactions even though it did not comply with to first obtain members' affirmative consent using a legal opt-in disclosure agreement before charging overdraft fees.

75. Based on information and belief, VCCU continues to opt members into its overdraft program using a non-compliant opt-in disclosure agreement, and then charges its members overdraft fees on certain one-time debit card and ATM transactions.

76. Based on information and belief, VCCU continues to charge existing members overdraft fees on one-time debit card and ATM transactions who had "opted-in" using that same non-compliant opt-in disclosure agreement.

77. VCCU also markets its overdraft program, which it calls "Courtesy Pay," as a way for members to incur debt in a manner that they would not be able to incur it through usual channels. For example, VCCU invites members to use Courtesy Pay to "cover items such as ATM withdrawals, up to a $1,000 limit" when funds in the account are not otherwise "available." Such marketing merely encourages members to obtain such debts on terms that are undisclosed at the time of the debt. While members are given 30 days to repay the overdraft, those who are "unable to repay the overdraft within 30 days" are invited to "contact" VCCU to "set-up a payment plan or make other arrangements to repay the amount owed." Regulation E overdraft programs were never intended to act as an inducement for consumers to take on loans without proceeding through the usual protections provided to lenders.

## PLAINTIFF'S HARM

78. Plaintiff has held an account with VCCU at all times relevant to the allegations and is believed to be opted into its overdraft program for his debit card and ATM transactions.

79.     As will be established using VCCU's own records, Plaintiff has been assessed numerous improper fees on debit card and ATM transactions.  For example, on September 6, 2020, Plaintiff was charged a $30 "Courtesy Pay" fee despite having a reported positive balance of $263.09 in the account at the time of the charge.  The next day, Plaintiff was charged several additional $30 "Courtesy Pay" fees for several transactions for which Plaintiff had sufficient funds in the account.  For example, VCCU charged Plaintiff a $30 "Courtesy Pay" fee for a $12.50 transaction that left $220.59 in his account.  Plaintiff was then charged an additional $30 Courtesy Pay fee for a $110 charge which left $80.59 in the account.  Thus, on just one day, Plaintiff was assessed nearly $100 in overdraft fees for transactions that left him with a positive account balance.

80.     The very next week, VCCU did the same thing again.  On September 15, 2020, Plaintiff made a $21.24 payment leaving him with a positive balance of $369.46 in his account.  Nevertheless, he was charged with a $30 Courtesy Pay fee.  Plaintiff was then charged three additional overdraft fees on transactions that left his account with a positive balance, including the last that left approximately $200 in his account.  Based on information and belief, VCCU assessed each of these fees although it used its non-compliant opt-in disclosure agreement to garner Plaintiff's affirmative consent to be charged these fees.  Thus, VCCU was not permitted to charge Plaintiff these fees.

81.     And then the next month, VCCU again charged Plaintiff Courtesy Pay fees for transactions that resulted in a positive account balance.  For example, on October 7, 2020, Plaintiff made a $200 withdrawal at an ATM that left him with $157.10 in the account.  Nevertheless, Plaintiff was charged with a $30 "Courtesy Pay" fee because of this transaction.

82.     The extent of improper charges VCCU assessed upon Plaintiff and other members will be determined in discovery using VCCU's records.

83.     Plaintiff did not and could not have, exercising reasonable diligence, discovered both that he had been injured and the actual cause of that injury until he met

with his attorneys in 2020.  While Plaintiff understood that he was assessed fees, he did not understand the cause of those fees until 2020 because VCCU hid its actual practices from its members by describing different practices in agreements and other materials it disseminated to its members.  This not only reasonably delayed discovery, but VCCU's affirmative representations and actions also equitably toll any statute of limitations, and also additionally equitably estop VCCU.

<h2 style="text-align:center"><u>CLASS ACTION ALLEGATIONS</u></h2>

84.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

85.     Plaintiff brings this case, and each of the respective causes of action, as a class action.

86.     The "Class" is composed of:

**<u>The Regulation E Class</u>**:

> All members of Defendant who have or have had accounts with Defendant who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning in the one year preceding the filing of this complaint and ending on the date the Class is certified.  Following discovery, this definition will be amended as appropriate.

**<u>The UCL, Section 17200 Class</u>**:

> All members of Defendant who have or have had accounts with Defendant who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning four-years preceding the filing of this complaint and ending on the date the Class is certified.  Following discovery, this definition will be amended as appropriate.

87.     Excluded from the Classes are: 1) any entity in which Defendant has a controlling interest; 2) officers or directors of Defendant; 3) this Court and any of its employees assigned to work on the case; and 4) all employees of the law firms representing Plaintiff and the Class Members.

88.     This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3).

89.   **Numerosity** – The members of the Class ("Class Members") are so numerous that joinder of all Class Members would be impracticable.  While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes based on the percentage of customers that are harmed by these practices with banks and credit unions with similar practices, that the Class is likely to include thousands of VCCU members.

90.   Upon information and belief, Defendant has databases, and/or other documentation, of its members' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of VCCU's members has been harmed by its practices and thus qualify as a Class Member.  Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice through mail or email, alternative proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

91.   **Commonality –** This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

- Whether Defendant used and/or uses the available balance for making a determination of whether to assess overdraft fees on one-time debit card and ATM transactions.
- Whether the opt-in disclosure agreement Defendant used and/or uses to opt-in Class Members violates Regulation E because Defendant's opt-in disclosure agreement does not accurately, clearly, and in an easily understandable way describe Defendant's overdraft services.
- Whether Defendant violated Regulation E when it assessed overdraft fees on one-time debit card and ATM transactions against Class Members.

- Whether Defendant violated Regulation E and/or TISA by using an opt-in disclosure agreement that did not clearly describe its overdraft services, by using inconsistent terminology regarding the balance used to assess overdraft fees, and by promoting overdraft services in an inaccurate and/or misleading way.

- Whether Defendant's conduct in violation of Regulation E also violates Section 17200.

- Whether Defendant's conduct in violation of TISA also violates Section 17200.

- Whether Defendant continues to violate Regulation E, TISA and/or Section 17200, by opting in members and the public using its opt-in disclosure agreement, and continuing to assess members overdraft fees on one-time debit card and ATM transactions based on its opt-in disclosure agreement.

92.     **Typicality** – Plaintiff's claims are typical of all Class Members.  The evidence and the legal theories regarding VCCU's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because the opt-in disclosure agreement VCCU used to opt-in Plaintiff is the same as the opt-in disclosure agreement VCCU used to opt-in the other Class Members.  Plaintiff and the Class Members have each been assessed overdraft fees on one-time debit card and ATM transactions.  Accordingly, Plaintiff will serve the interests of all Class Members.

93.     **Adequacy** – Plaintiff will fairly and adequately protect the interests of the Class Members.  Plaintiff has retained competent counsel experienced in class action litigation, and specifically financial institution overdraft class action cases to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate.  Plaintiff and counsel intend to prosecute this action vigorously.

94.   **Predominance and Superiority** – The matter is properly maintained as a class action because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class Members are relatively small compared to the cost of the litigation, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for Defendant's wrongful conduct.  Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of its ill-gotten gains.

95.   Plaintiff does not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiff has demonstrated above that his claims are typical of the other Class Members and that he will adequately represent the Class.  This particular forum is desirable for this litigation because Plaintiff's claims arise from activities that occurred largely therein.  Plaintiff

does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

96.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

97.     This matter is properly maintained as a class action pursuant to Federal Rules of Civil Procedure, Rule 23 in that without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual customers of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual customers of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

- adjudication with respect to individual customers of the Class would, as a practical matter, be dispositive of the interests of the other customers not parties to the adjudication or substantially impair or impede their ability to protect their interests.

Common questions of law and fact exist as to members of the Class and predominate over any questions affecting only individual customers, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

- the interests of the customers of the Class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against customers of the Class;

- the desirability or undesirability of concentrating the litigation of the

Class Action Complaint
Case No.:

claims in the particular forum; and the difficulties likely to be encountered in the management of a class action.

98.   Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole under Federal Rule of Civil Procedure 23(b)(2). Moreover, on information and belief, Plaintiff alleges that Defendant's use of a non-compliant Regulation E opt-in disclosure agreement is substantially likely to continue in the future if an injunction is not entered.

## FIRST CAUSE OF ACTION
### (Violation of Regulation E)

99.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

100.   By charging overdraft fees on ATM and non-recurring debit card transactions, Defendant violated Regulation E, 12 C.F.R. §§ 1005, *et seq*., whose "primary objective" is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*., the 'EFTA,'" 12 C.F.R. § 1005.1(b).

101.   Specifically, Defendant's conduct violated Regulation E's "Opt In Rule." *See* 12 C.F.R. § 1005.17.  The Opt In Rule states:  "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program. *Id*. (emphasis added).  The notice "shall be clear and readily understandable." 12 C.F.R. § 1005.4(a)(1).  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in after receiving the

description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.  Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account, nor can the financial institution influence a customer's decision to opt-in.

102.   The intent and purpose of this opt-in disclosure agreement is to "assist customers in understanding how overdraft services provided by their institutions operate . . . by explaining the institution's overdraft service . . . in a clear and readily understandable way"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 59040, 59048, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E.  *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z)).

103.   Defendant failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution may assess overdraft fees against customer accounts through an overdraft program for ATM withdrawals and non-recurring debit card transactions.  Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide members an accurate and non-ambiguous description of the overdraft program that members can understand in a "clear and readily understandable way."  Further, the opt-in disclosure agreement fails to include all of the Regulation E required disclosures, and includes other prohibited information.

104.   As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining valid affirmative consent to do so, Defendant was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions, and it has harmed Plaintiff

and the Class Members by assessing overdraft fees on one-time debit card and ATM transactions.

105. As the result of Defendant's violations of Regulation E, 12 C.F.R. § 1005, *et seq.*, Plaintiff and members of the Class are entitled to statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C. § 1693m.

**SECOND CAUSE OF ACTION**

**(Violation of California Unfair Competition Law,**

**Bus. & Prof. Code, §§ 17200, *et seq*.)**

106. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

107. Defendant's conduct described herein violates California's Unfair Competition Law (the "UCL"), codified at Business and Professions Code section 17200, *et seq*. The UCL prohibits, and provides civil remedies for, unlawful and unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language. By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to serve as the basis of an independently actionable unfair competition claim and sweeps within its scope acts and practices not specifically proscribed by any other law.

108. As further alleged herein, Defendant's conduct violates the UCL's "unfair" prong. First, VCCU's conduct violates the UCL insofar as Defendant charges overdraft or NSF fees in violation of Regulation E. Defendant's conduct was not motivated by any legitimate business or economic need or rationale.

109. The harm and adverse impact of Defendant's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives. The harm to Plaintiff and Class Members arising from Defendant's unfair practices relating to the imposition of the improper fees outweighs

the utility, if any, of those practices.

110.    Defendant's unfair business practices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class Members, and the general public.  Defendant's conduct was substantially injurious to consumers in that they have been forced to pay improper, abusive, and/or unconscionable overdraft fees.

111.    Moreover, Defendant's conduct also violates the UCL's unlawful prong to the extent Defendant violated Regulation E by failing to accurately describe the circumstances when Plaintiff and Class Members would be assessed an overdraft fee and/or NSF fee.

112.    Regulation E provides:  "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program.  *See* 12 C.F.R. § 1005.17.  The notice "shall be clear and readily understandable."  (12 C.F.R. § 205.4(a)(1).)  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.  The intent and purpose of this is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> . . . by <u>explaining</u> the institution's overdraft service . . . in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary, (74 Fed. Reg. 59033, 59035, 59037, 59040, 59048), which is "the CFPB's official interpretation of its own regulation," and "warrants deference from the courts unless 'demonstrably

irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)* (S.D. N.Y. 2016) 179 F.Supp.3d 320 (quoting *Chase Bank USA v. McCoy* (2011) 562 U.S. 195, 211 (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).)

113.   Second, Defendant's conduct in advertising its overdraft program as a de facto short-term credit facility is also an unfair business practice pursuant to the UCL. VCCU's advertising encourages consumers to engage in financial behavior that increases risk not only to the institution, but to the individual consumer.  Without accounting for the usual protections before a consumer enters into a debt, the consumer can get quickly caught in a situation that the consumer cannot handle.  Defendant can induce consumers to take on sizable debts for a putatively interest-free teaser period, after which those same consumers will be required to convert their debts to an interest-bearing loan.  And because the consumer has already incurred the debt (at VCCU's invitation), VCCU has all the leverage in setting the terms of repayment.

114.   Here, as alleged herein, Defendant has violated the unlawful prong of California's UCL as a result of violating Regulation E's prohibitions against using an opt-in disclosure agreement that misinformed members about its overdraft policies and did not satisfy Regulation E's requirements.

115.   In addition, under TISA, credit union disclosures must be presented in a format allowing members to readily review the terms of the account.  They must also use consistent terminology to describe terms.  12 C.F.R. § 707.3.  When a credit union promotes the payment of overdrafts in advertisements, it must do so accurately, clearly, and conspicuously, and in a non-misleading way.  12 C.F.R. § 707.8; 12 C.F.R. § 707.11 (b).

116.   Defendant has violated the unlawful prong of the UCL as a result of violating TISA by, among other things, providing inaccurate disclosures and agreements and failing to clearly and conspicuously identify its true overdraft practices,

by using inconsistent terminology for its overdraft terms, and by improperly marketing its overdraft program.

117.   As a result of Defendant's UCL violations, Plaintiff and Class Members have paid improper overdraft fees and thereby have suffered actual loss of money. Absent injunctive relief forcing Defendant to disgorge itself of its ill-gotten gains and public injunctive relief prohibiting Defendant from misrepresenting and omitting material information concerning its overdraft policy at issue in this action in the future, Plaintiff and other existing members, and the general public, will suffer from and be exposed to Defendant's conduct violative of the UCL.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Putative Class pray for judgment as follows:

     a.    for an order certifying this action as a class action;

     b.    for compensatory damages on all applicable claims and in an amount to be proven at trial;

     c.    for an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

     d.    for statutory damages;

     e.    for civil penalties;

     f.    for an order enjoining the continued wrongful conduct alleged herein;

     g.    for costs;

     h.    for pre-judgment and post-judgment interest as provided by law;

     i.    for attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

     j.    for such other relief as the Court deems just and proper.

Class Action Complaint
Case No.:

Dated: July 22, 2021

Respectfully Submitted,

*/s/ Richard D. McCune*

Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
David C. Wright (State Bar No. 177468)
dcw@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile:   (909) 557 1275

Emily J. Kirk (IL Bar No. 6275282)*
ejk@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone:  (618) 307-6116
Facsimile:   (618) 307-6161

Attorneys for Plaintiff David White
and the Putative Class

## **DEMAND FOR JURY TRIAL**

Plaintiff and the Putative Class demand a trial by jury on all issues so triable.

Dated: July 22, 2021

*/s/ Richard D. McCune*

Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
David C. Wright (State Bar No. 177468)
dcw@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile:   (909) 557 1275

Emily J. Kirk (IL Bar No. 6275282)*
ejk@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone:  (618) 307-6116
Facsimile:   (618) 307-6161

Attorneys for Plaintiff David White
and the Putative Class

**Pro Hac Vice* application to be submitted

Class Action Complaint
Case No.: